**T. L. LESTER, Appellant,**

v.

**Joe E. WEDDLE, Jr., et ux., Appellees.**

**No. 338.**

Court of Civil Appeals of Texas.
Tyler.

March 28, 1968.

Rehearing Denied April 18, 1968.

Ramey, Brelsford, Flock & Devereux, Richard Grainger and Michael A. Hatchell, Tyler, for appellant.

Woodrow Edwards, Mt. Vernon, Ivan Alexander, Jr., Emory, for appellees.

SELLERS, Justice.

Joe E. Weddle and wife brought this suit to recover for the death of their eight-year-old son who was struck by a truck and trailer loaded with calves belonging to T. L. Lester, the appellant herein, who was driving the truck at the time of the collision and death of Jim E. Weddle, appellees' son. The accident happened about 8 o'clock in the morning on November 7, 1966. Visibility was good. The Weddles lived on Highway 19, some two miles south of the town of Emory in Rains County, Texas. The appellant with his load of cattle was driving south on Highway 19 at a speed of about 45 miles per hour when he saw a child standing alone near an auto parked on the east side of Highway 19 in front of what proved to be the Weddle home. At the time he saw the car and the child, he was several hundred feet from them. The appellant instantly took his foot off the accelerator which had the effect of reducing the speed of the truck from 45 miles per hour to between 45 and 40 miles per hour when the accident happened.

The grounds of negligence alleged by the appellees against the appellant are as follows:

"Plaintiffs allege that at the time and on the occasion in question defendant T. L. Lester failed to use ordinary care toward their deceased son, Jim E. Weddle, in that defendant:

"(1) Failed to keep a proper lookout;

"(2) Failed to stop his pickup in time to avoid collision with their son's body;

"(3) Failed to turn right in time to avoid the said collision, when he had the time and means to do so.

"Plaintiffs further allege that each of the above omissions to act on the part of defendant was a proximate cause of

the collision which resulted in their son's death."

Appellant filed his plea of privilege to be sued in Van Zandt County where he lives. This plea was contested by the appellees alleging venue in Rains County where the accident occurred under the venue statue placing venue in the county where a trespass occurs. After a hearing on the venue issue, the trial court sustained venue in Rains County, and the appellant has duly prosecuted this appeal.

The appellant in his Brief asserts that there is no evidence of any negligent act or trespass committed by appellant in Rains County, and that the trial court was in error in so holding. He likewise asserts that the evidence is against the great weight and overwhelming preponderance of the evidence.

The record is clear that Jim Weddle was out on the side of the highway waiting for the school bus to arrive and to notify the other Weddle children that the bus was coming. The bus usually came about 8 o'clock. The controlling evidence was given by appellant as follows:

"Q  Mr. Lester, you traveled, traveling out of Emory on Highway 19 in a southerly direction were you involved in an accident shortly the other side of the city limits of Emory?

"A  Yes sir.

"Q  Could you tell us what it was that happened down there?

"A  Well, when I got where I could see, I saw a car, it was stopped on the right-hand side of the road, and as I got, approached it I could see a little boy standing by the front fender of the car, at the front part of the car, and I saw it was a child, and I just took my foot off the gas, raised my foot up, and when I got close enough, well the child turned and walked toward the door,

back door of the car like he was getting in the car, and so my thought was they stopped to pick him up to take him to school, and just as I got even with the car, the car started up and a little dog ran out from behind the car, and I honked my horn and whipped to the right, and as I did, a little boy darted out from behind the car right into the side of my pickup.

"*  *  *

"Q  Well, how far would you say you were outside the town of Emory?

"A  Oh, approximately two miles.

"Q  Would that be your answer as to how far you were from where you turned off of 69, we'll say, at the intersection of 69, Highway 69 and Highway 19?

"A  Approximately two miles.

"Q  All right, sir. Now, how far from where your truck was located on Highway 19 was it to where the car was stopped on Highway 19 facing you?

"A  Well, I couldn't see the car till I go, oh, approximately one hundred yards because I went over a little hill.

"Q  Yes sir. And when you came over the top of this hill then you saw the car situated at the bottom of the hill?

"A  Well, it wasn't at the bottom of the hill, no sir, it was up the hill a little ways.

"Q  And this car was stopped?

"A  Well, best, I didn't know it at the time, but as I got closer I could tell that it was stopped.

"Q  And of course it was facing north on Highway 19?

"A  Yes sir.

"Q  All right, sir.  Now, then, where was the, where were you when you first observed the little boy?

"A  Well, about two hundred feet from the car I guess, approximately.

"Q  Did you later learn that this boy was Jim Weddle?

"A  Yes sir.

"Q  All right, sir.  Now, Mr. Lester, as you approached this stopped car traveling south on Highway 19, how far did you travel from the time that you first saw this car until you met the car?

"A  Oh, approximately one hundred yards, seventy-five to a hundred yards.

"Q  And at that time the car was traveling north on Highway 19?

"A  Yes sir.

"Q  All right, sir.  Now, you mentioned about seeing a dog; tell us what this dog did?

"A  It darted out from behind that car across the road in front of me.

"Q  How far behind the dog was the boy?

"A  Immediately behind it.

"Q  You told me, did you not, that when you saw this car stopped that you took your foot off the accelerator of your pickup?

"A  I just raised my foot up.

"Q  Why did you do that, sir?

"A  Well, natural instinct when I see somebody on the road that I do that.

"Q  Natural instinct for what reason, sir?

"A  Well, see a child on the road, side of the road.

"Q  Did you take any other action in regard to the control of your vehicle at that time?

"A  No sir.

"Q  Why didn't you, sir?

"A  Well, I didn't think it was necessary.

"Q  When was the next time that you raised your foot off of the accelerator on your vehicle from that time until the point of impact?

"A  Well, I never did put it completely back up, I just had my foot laying down there, I never did give it anymore gas.

"Q  What was the next action you took in regard to the control of your vehicle then?

"A  I hit my brakes after the incident.

"Q  After the incident?

"A  Yes sir.

"Q  What do you mean by the incident?

"A  After the little boy ran into the side of the pickup.

"   *   *   *

"Q  All right, sir.  How fast were you traveling, Mr. Lester, when you first observed this car stopped on the east side of Highway 19?

"A  I'd say about forty-five miles an hour.

"Q  How fast were you traveling at the point of the impact between your vehicle and the Weddle child?

"A  Well, I'd estimate about forty, between forty and forty-five.

"Q  And you were going downhill all of that time, is that correct?

"A.  Slight downgrade.

"Q  Wouldn't your truck normally have picked up speed on a downhill grade?

"A  Not necessarily.

"Q Did you ever attempt to turn your vehicle to the right or the left?

"A Yes sir.

"Q Which direction?

"A To the right.

"Q And at what point did you attempt to do that?

"A When I first saw the little dog.

"Q Did you move your vehicle to the right?

"A Yes sir.

"Q In relation to the center stripe in Highway 19, where was the point of impact located where you struck the Weddle child?

"A Over in my lane about, say, three foot from the centerline, four, approximately.

"Q How far did you travel in your vehicle after the point of impact, Mr. Lester?

"A Well, approximately two hundred feet or two-fifty.

"Q All right, sir. And this was after you had started applying your brakes immediately?

"A Yes sir.

"Q So would it be safe to say that it takes you two hundred to two hundred fifty feet to stop that particular vehicle traveling at forty to forty-five miles per hour?

"A Not necessarily, I just didn't come to a quick stop, I stopped as quick as I could without endangering turning the pickup over.

"Q After you stopped your vehicle on the, on which side of the road did you stop your vehicle, sir?

"A Right-hand side."

Under this evidence, the appellant in his Brief takes the position that the facts bring the case within the rule of "sudden appearance" of a child, with the motorist being unable to avoid the collision, and cites many authorities to support the rule.

We overrule this contention, and believe the evidence sufficient to support the trial court's conclusion that a trespass was committed in Rains County in that appellant failed to keep a proper lookout to avoid the striking of Jim Weddle and failed to keep his truck under control, each of which was the proximate cause of the accident. The facts in our opinion bring the case within the rule which governs the conduct of one driving a truck and seeing a child in or near the highway. Blashfield Cyclopedia of Automobile Law and Practice, Volume 4, Section 151.12, page 202, states the rule as follows:

"A motorist seeing a child or children in or near the street or highway must exercise a far greater degree of care and watchfulness than is required of him as to a pedestrian similarly placed who has reached the age of discretion; and a person driving on a city street through a crowd of children is required to exercise the greatest care possible for their safety. Accordingly, where an automobile driver sees a child in a place of danger, or has reason to apprehend that it might run into a place of danger, and has sufficient time to stop his car if under proper control, it is his duty to exercise such care as would be reasonably necessary to avoid a collision. The mere presence of children is itself a warning because of the unpredictable nature of their conduct.

"The degree or extent of care required of a motorist to avoid injury to a child may depend on whether the child was alone or was accompanied by an adult, greater care being required

when the child is not accompanied by an adult.

"A driver of an automobile seeing children in or near the street or highway should take proper steps for their protection if under the circumstances he should anticipate that they will get in his way. He should turn as far away from them as is practicable under the circumstances, and must have his automobile under control.

"Where children are on the sidewalk and corners, it is the duty of a motorist to drive his machine at such a rate of speed as will give him control thereof in an emergency. Where the driver is aware of the presence of children he may be held responsible although it appears that he did not see the injured child in time to prevent the injury.

"However, there is no liability on the part of the motorist in the absence of negligence, since he is not an insurer."

The appellant by his own admission did nothing to bring his truck under control after seeing the child standing alone on the side of the road except to remove his foot from the accelerator and after colliding with the child, he ran some 200 feet before he could stop his truck with safety. It is true that appellant now says that he surmised the child got in the car; however, it would have been just as easy to surmise that the child got out of the car to catch the school bus, neither of which would have been correct, and neither of which should excuse the appellant from reducing the speed of his truck to where he could have stopped the same when the emergency existed. Had he reduced the speed of his truck to where it would have been under control, the accident in all probability would not have occurred. Self

v. Kirkpatrick, 194 Ark. 1014, 110 S.W.2d 13; Red Arrow Freight Lines, Inc. v. Smith et ux, Tex.Civ.App., 93 S.W.2d 495, 499.

We quote from the last cited case as follows:

"* * * It seems to us that the driver of appellant's truck owed the duty to check up the speed of his truck to a much less rate than he said he was going before and at the time of the accident. He then saw and had passed the school zone notice, saw children on the school grounds, and the uncontroverted evidence of other witnesses shows that other children were on the highway going toward the school grounds at the time of the accident. Conceding that the driver of appellant's truck did all that he could do to avoid striking the boy after he saw him go upon the highway in front of his truck, yet, by his failure to use that degree of care that an ordinarily prudent person would ordinarily use under the same circumstances, it seems to us he created the danger of injuring some child he now says was unavoidable. While the driver of the truck had the right, under ordinary circumstances, to drive on the highway at the rate of 25 miles per hour, we think, under the undisputed circumstances, there could be no question but that he should have checked up his speed to a much less speed than he said he was going at the time of the accident. * * *"

The trial was before the court without a jury, and we are of the opinion that the evidence was ample to support the court's finding of a trespass in Rains County and therefore retain venue in that county.

The judgment of the trial court is affirmed.